## IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| KIANA ROYLES | ) | CASE NO. |
| 1100 Springfield Pike, Apt. 1 | ) | |
| Cincinnati, OH 45215 | ) | JUDGE: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT FOR DAMAGES** |
| TRIHEALTH, INC. | ) | **AND INJUNCTIVE RELIEF** |
| 625 Eden Park Drive, 7th Floor | ) | |
| Cincinnati, OH 45202 | ) | **JURY DEMAND ENDORSED** |
| | ) | **HEREIN** |
| **Serve also:** | ) | |
| | ) | |
| TriHealth, Inc. | ) | |
| c/o OSAC, INC. (Stat. Agent) | ) | |
| 100 S. Third Street | ) | |
| Columbus, OH 43215 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| THE GOOD SAMARITAN HOSPITAL | ) | |
| OF CINCINNATI, OHIO | ) | |
| 625 Eden Park Drive, 7th Floor | ) | |
| Cincinnati, OH 45202 | ) | |
| | ) | |
| **Serve also:** | ) | |
| | ) | |
| The Good Samaritan Hospital of | ) | |
| Cincinnati, Ohio | ) | |
| c/o OSAC, INC. (Stat. Agent) | ) | |
| 100 S. Third Street | ) | |
| Columbus, OH 43215 | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Kiana Royles by and through undersigned counsel, as her Complaint against the

Defendants, states and avers the following:

## PARTIES

1. Royles is a resident of the city of Cincinnati, Hamilton County, Ohio.

2. At all times herein, Royles was acting in the course and scope of her employment.

3. Defendant TriHealth, Inc. ("TriHealth") is a domestic, non-profit corporation that conducts business throughout the state of Ohio, with its principal place of business located at 625 Eden Park Drive, 7th Floor, Cincinnati, OH 45202.

4. Defendant The Good Samaritan Hospital of Cincinnati, Ohio is a domestic, non-profit corporation that conducts business throughout the state of Ohio, with its principal place of business located at 625 Eden Park Drive, 7th Floor, Cincinnati, OH 45202.

5. For the purposes of this Complaint, TriHealth and The Good Samaritan Hospital of Cincinnati, Ohio will be collectively referred to as "Good Samaritan."

6. The relevant location of the events and omissions of this Complaint took place at Good Samaritan Hospital's location at 6949 Good Samaritan Dr, Cincinnati, OH 45247.

7. Good Samaritan is, and was at all times hereinafter mentioned, Royles' employer within the meaning of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2617, *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C §2000e, and Ohio R.C. § 4112, *et seq.*

8. Within 300 days of the adverse employment actions described herein, Royles filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 473-2021-01357 ("EEOC Charge").

9. On January 25, 2022, per Royles' request, the EEOC issued and mailed a Dismissal and Notice of Rights letter regarding the EEOC Charge.

10. Royles received the Dismissal and Notice of Rights letter from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1), which has been attached hereto as Plaintiff's Exhibit1.

11. Royles has filed this Complaint on or before the 90-day deadline set forth in the Dismissal and Notice of Rights letter.

12. Royles has properly exhausted all administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

## JURISDICTION & VENUE

13. All the material events alleged in this Complaint occurred in or around Hamilton County, Ohio.

14. Therefore, personal jurisdiction is proper over Defendants pursuant to R.C. § 2307.382(A)(1) and/or (3).

15. Venue is proper pursuant to Civ. R. 3(C)(1), (2), (3), and/or (6).

16. This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

## FACTS

17. Royles is a former employee of Good Samaritan.

18. At all times noted herein, Royles was qualified for her position(s) with Good Samaritan.

19. At all times noted herein, Royles could fully perform the essential functions of her job(s).

20. Royles worked for Good Samaritan from 2012, until Good Samaritan unlawfully terminated her employment on or about February 23, 2021.

21. Good Samaritan initially hired Royles as a Licensed Practical Nurse ("LPN") in 2012.

22. Royles earned her license as a Registered Nurse ("RN") in 2016, and this was the position she held until her termination.

23. Royles had an exemplary employment record with no significant history of discipline in the nine years she worked for Good Samaritan. Indeed, Royles regularly received positive feedback on her performance, and she always went above and beyond to make sure the job got done right.

24. Despite Royles' previously positive employment record, Good Samaritan terminated her employment without notice or cause shortly after she complained of racial discrimination in the workplace and the day after she returned from protected medical leave.

25. Royles is bi-racial, and thus, is in a protected class for her race under Title VII and Ohio R.C. § 4112.

26. After the death of George Floyd on May 25, 2020, while in the custody of police -- an act which sparked nationwide discussion of civil rights -- Royles felt an increased tension at work.

27. Nurses and doctors spoke frequently about the Floyd killing and the resulting racial turmoil. As an example, Royles was present at a nurses' station when a Caucasian nurse commented that criminals like Floyd die as a result of breaking the law.

28. Royles also heard Caucasian nurses at the station say the Black Lives Matter ("BLM") protesters were rioters, looter, and criminals. Royles heard another Caucasian nurse say in response that all lives matter too, not just Black lives.

29. Royles was offended and hurt that her coworkers had such a negative attitude regarding the humanity of people like Royles – African American people.

30. Royles offered to explain to the nurses that "Black Lives Matter" was a slogan because many people did not agree that Black people's lives were important lives. The nurses rolled their eyes in response to Royles' explanation.

31. Royles reported the nurses' comments to her supervisor Carolyn Slone (Nurse Manager). Slone agreed to speak with the nurses about their racial commentary at work.

32. After Royles' complaint to Slone, the nurses refused to speak when Royles entered the nurses' station.

33. In September 2020, Royles contacted Good Samaritan's Diversity Department.

34. Diversity told Royles they recognized a diversity problem at Good Samaritan and were in the process of remedying it by hiring more diverse employees.

35. Royles told Diversity that after she made her complaint to Slone about racial comments at work, nurses refused to speak when Royles entered the station.

36. Diversity contacted Slone and presented racial sensitivity training at a staff meeting. Royles was present at the racial sensitivity training, which lasted less than 15 minutes.

37. It was evident to Royles that the racial sensitivity training was ineffective because Caucasian employees walked out of the meeting saying, "I don't know what they are talking about because I don't have white privilege; I worked hard for what I've got."

38. Slone told Royles the Diversity department was supposed to be present at every staff meeting, but they never returned.

39. Royles knew by the lack of effective training, and the disregard for effective training, that Good Samaritan and Slone would do nothing to remedy the racial tension building at work.

40. In November 2020, a Certified Registered Nurse Anesthetist (CRNA) saw a BLM sticker on Royles' water bottle and began telling Royles that BLM was an organization owned by rich White people, as if that would lessen the meaning in the slogan.

41. Royles told the CRNA she did not agree with his statement, but she did agree with the slogan that Black peoples' lives matter.

42. The CRNA then began an offensive conversation about abortion. Royles was offended that the CRNA compared the civil rights of Black people to the political ideologies of abortion.

43. On or about January 27, 2021, Slone asked Royles about the work environment. Royles told Slone the tensions did not improve because nurses and doctors continued to make offensive racial comments, which were not constructive to work duties.

44. Slone told Royles that employees complained about Royles wearing a BLM t-shirt with scrub pants. Slone considered the BLM t-shirt a political statement, which was prohibited at work.

45. Royles corrected Slone and explained the BLM shirt was expressive of a civil rights movement, not of a political ideology. Slone told Royles it is Good Samaritan's policy to wear only hospital clothing.

46. Royles complained that for the past two years, any employee could wear any t-shirt without complaint, but now that Royles reported racial comments at work, she was not allowed to wear a civil rights t-shirt.

47. Royles asked why Slone wanted to enforce company policy only after Royles wore a Black peoples' civil rights t-shirt. Slone responded that she could not speak about that issue.

48. On January 31, 2021, Royles took protected medical leave under the FMLA because she experienced COVID-19 symptoms.

49. Royles' doctor's note excused her from work until March 2021.

50. Royles remained off work on FMLA for COVID-19 symptoms for three weeks, after which she stopped exhibiting symptoms of COVID-19.

51. Instead of remaining home until March, as per the doctor's note, Royles returned to work on February 22, 2021. However, Royles was late returning to work February 22, 2021 because of a family emergency.

52. On February 23, 2021, Slone met with Royles in Human Resources. Slone terminated Royles' employment purportedly because Royles was tardy to work the previous day.

53. Royles had never been previously disciplined for being tardy to work.

54. Good Samaritan has a progressive discipline policy that calls for escalating levels of discipline in response to policy violations, beginning with verbal warnings, followed by a written warning, and ultimately leading up to termination.

55. Good Samaritan willfully skipped progressive disciplinary steps in terminating Royles' employment.

56. Good Samaritan did not give Royles a verbal or written warning prior to termination.

57. Good Samaritan follows their progressive discipline policy when Caucasian employees have been tardy for work.

58. Skipping steps in the progressive discipline systems is an adverse employment action.

59. Similarly, Good Samaritan has followed its progressive discipline policy when terminating Caucasian employees.

60. Terminating Royles' employment is an adverse employment action.

61. Royles worked for Good Samaritan for more than eight years without issue. It was not until after the death of George Floyd, and the subsequent surge in the BLM movement, that she began experiencing disparate treatment, offensive comments, and discrimination from her Caucasian coworkers

E-FILED 04/12/2022 02:37 PM  /  CONFIRMATION 1177986  /  A 2201292  /  COMMON PLEAS DIVISION  /  IFIJ

62. Royles made multiple complaints to her manager and to HR of racially offensive comments and behavior in the workplace.

63. Good Samaritan terminated Royles' employment due to her race and/or her complaints of race discrimination in the workplace.

64. Further, Royles took protected medical leave under the FMLA, and she returned to work earlier than prescribed by her doctor's orders. The day after Royles returned, Good Samaritan terminated her employment.

65. Good Samaritan terminated Royles' employment in retaliation for her taking protected medical leave under the FMLA.

66. Good Samaritan' purported reason(s), or lack thereof, for Royles' employment termination was pretextual.

67. Good Samaritan actually terminated Royles' employment discriminatorily against her race, to retaliate against her for using her protected FMLA rights, and/or in retaliation against her protected complaints.

68. As a direct and proximate result of Good Samaritan's conduct, Royles suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

**COUNT I: RACIAL DISCRIMINATION IN VIOLATION OF R.C. §4112, *et seq*.**

69. Royles restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

70. Royles is African American, and thus is in a protected class for her race.

71. R.C. § 4112, *et seq*., provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's race.

72. Defendants treated Royles differently than other similarly situated employees based upon her race.

73. Defendants' termination of Royles was an adverse employment action against her.

74. Defendants' purported reason(s) for Royles' termination was pretextual.

75. Defendants actually terminated Royles' employment due to her race.

76. Defendants violated R.C. § 4112, *et seq*., by terminating Royles because of her race.

77. Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by treating Royles differently from other similarly situated employees outside her protected class.

78. Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by applying its employment policies in a disparate manner based on Royles' race.

79. Defendants violated R.C. § 4112.02 and R.C. § 4112.99 by applying its disciplinary policies in a disparate manner based on Royles' race.

80. Royles incurred emotional distress damages as a result of Defendants' conduct described herein.

81. As a direct and proximate result of Defendants' acts and omissions, Royles has suffered and will continue to suffer damages.

## <u>COUNT II: RACIAL DISCRIMINATION IN VIOLATION OF TITLE VII</u>

82. Royles restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

83. Royles is African American, and thus is in a protected class for her race.

84. Title VII provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's race.

85. Defendants treated Royles differently than other similarly situated employees based upon her race.

86. Defendants' termination of Royles was an adverse employment action against her.

87. Defendants' purported reason for Royles' termination was pretextual.

88. Defendants actually terminated Royles' employment due to her race.

89. Defendants violated Title VII by terminating Royles because of her race.

90. Defendants violated Title VII by treating Royles differently from other similarly situated employees outside her protected class.

91. Defendants violated Title VII by applying its employment policies in a disparate manner based on Royles' race.

92. Defendants violated Title VII by applying its disciplinary policies in a disparate manner based on Royles' race.

93. Royles incurred emotional distress damages as a result of Defendants' conduct described herein.

94. As a direct and proximate result of Defendants' acts and omissions, Royles has suffered and will continue to suffer damages.

## <u>COUNT III: RETALIATION</u>

95. Royles restates each and every prior paragraph of this complaint, as if it were fully restated herein.

96. As a result of Defendants' discriminatory conduct described above, Royles made protected complaints to her manager and HR of the discrimination, harassment, and disparate treatment she was experiencing.

97. Subsequent to Royles' protected complaints, Defendants took adverse employment actions against Royles, including terminating her employment.

98. Defendants' actions were retaliatory in nature based on Royles' opposition to the unlawful discriminatory conduct.

99. Pursuant to R.C. § 4112, *et seq*., and Title VII, it is an unlawful discriminatory practice to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice.

100. As a direct and proximate result of Defendants' retaliatory discrimination against and discharge of Royles, she has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT IV: RETALIATION IN VIOLATION OF THE FMLA

101. Royles restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

102. During her employment, Royles qualified for, applied for, and took protected medical leave under the FMLA.

103. At all times relevant, Royles was an eligible employee under the FMLA.

104. At all times relevant, Defendants were employers under the FMLA.

105. At all times relevant, Royles was entitled to protected leave under the FMLA.

106. Defendants knew Royles took FMLA leave.

107. After Royles utilized her qualified FMLA leave, Defendants retaliated against her by, among other actions, terminating her employment.

108. Royles' termination was an adverse employment action against her.

109. Defendants' proffered reason for Royles' termination was pretextual.

110.     There was a causal link between Royles' medical leave under the FMLA and Defendants' termination of Royles' employment.

111.     Defendants actually terminated Royles for her FMLA use.

112.     Defendant retaliated against Royles by terminating her employment.

113.     Defendants' actions show that it willfully retaliated against Royles in violation of U.S.C. § 2615(a).

114.     As a direct and proximate result of Defendants' wrongful conduct, Royles is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs, and reasonable attorney's fees.

## DEMAND FOR RELIEF

WHEREFORE, Royles demands from Defendants the following:

a)  Issue a permanent injunction:

    i.  Requiring Defendants to abolish discrimination, harassment, and retaliation;

    ii.  Requiring allocation of significant funding and trained staff to implement all changes within two years;

    iii.  Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

    iv.  Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

12

      v.    Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

b) Issue an order requiring Defendants to expunge Royles' personnel file of all negative documentation;

c) An award against each Defendant for compensatory and monetary damages to compensate Royles for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

d) An award of punitive damages against each Defendant in an amount in excess of $25,000;

e) An award of reasonable attorneys' fees and non-taxable costs for Royles' claims as allowable under law;

f) An award of the taxable costs of this action; and

g) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

*/s/ Matthew G. Bruce*
Matthew G. Bruce (0083769)
    Trial Attorney
Brianna R. Carden (0097961)
**SPITZ, THE EMPLOYEE'S LAW FIRM**
Spectrum Office Tower
11260 Chester Road, Suite 825
Cincinnati, OH 45246
Phone: (216) 291-0244 x173
Fax:   (216) 291-5744
Email: Matthew.Bruce@SpitzLawFirm.com
Email: Brianna.Carden@SpitzLawFirm.com

*Attorneys for Plaintiff Kiana Royles*

13

## JURY DEMAND

Plaintiff Kiana Royles demands a trial by jury by the maximum number of jurors permitted.

/s/ Matthew G. Bruce
Matthew G. Bruce (0083769)
**SPITZ, THE EMPLOYEE'S LAW FIRM**

14