**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| KIANA ROYLES, | : | Case No. 1:22-cv-260 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| TRIHEALTH, INC., et al., | : | |
| | : | |
| Defendants. | : | |

---

### ORDER AND OPINION

---

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 31) and Motion to Strike (Doc. 34). Plaintiff filed responses in opposition to both motions. (*See* Docs. 33, 36.) Defendants filed a Reply in Support of their Motion for Summary Judgment (Doc. 35), but did not file a reply in support of their Motion to Strike (Doc. 34). Thus, these matters are ripe for the Court's review. For the reasons below, Defendants' Motion for Summary Judgment (Doc. 31) is **GRANTED** and Defendants' Motion to Strike (Doc. 34) is **DENIED**.

### FACTS

Defendant TriHealth, Inc. hired Plaintiff, a biracial individual, in 2012 and assigned her to work at Cincinnati Children's Hospital Medical Center ("CCHMC"). (Plaintiff Dep., Doc. 29, Pg. ID 967; Performance Counseling Form, Doc. 29-28, Pg. ID 1114.) Plaintiff first worked as a Licensed Practical Nurse and later became a Registered Nurse ("RN") in 2016. (Plaintiff Dep., Doc. 29, Pg. ID 966.) TriHealth works in partnership

with Defendant The Good Samaritan Hospital of Cincinnati, Ohio. (*See* Slone Dep., Doc. 27, Pg. ID 876.) This case relates to Defendants' termination of Plaintiff in February 2021. (*See* Performance Counseling Form, Doc. 29-28, Pg. ID 1114.)

## I.  Relevant Policies and Procedures

TriHealth has an Employee Code of Conduct designed to create a supportive environment by encouraging its employees to be "professional, ethical, and respectful." (TriHealth Code of Conduct, Doc. 29-9, Pg. ID 1042.) The Code of Conduct lists types of conduct that TriHealth considers inappropriate, including excessive tardiness, "conduct disruptive to fellow employees," and "conduct by an individual working in the organization that intimidates others to the extent that quality and safety could be compromised." (*Id.* at Pg. ID 1043.) The policy notes that "[f]ailure to comply with [the Code] may result in performance counseling up to and including termination." (*Id.* at Pg. ID 1045.)

TriHealth also has a policy on "Workplace and Domestic Violence." (TriHealth Workplace and Domestic Violence Policy, Doc. 29-10.) The policy notes that TriHealth "will not tolerate actual or threats of assault, battery, harassment, intimidation, threatening or hostile behaviors of any kind, . . . or any other act, which in management's opinion, is dangerous or inappropriate in the workplace." (*Id.* at Pg. ID 1046.) An employee's violation of this policy "will lead to disciplinary actions up to and including termination." (*Id.* at Pg. ID 1047.)

TriHealth also advises its employees that "there is no responsibility more important than to SERVE our patients" and to align themselves with the "ALWAYS"

2

behaviors. (SERVE and ALWAYS Standards, Doc. 29-11, Pg. ID 1056-57; SERVE Standard, Doc. 29-12.) In line with the SERVE standards and ALWAYS behaviors, an employee must always "respect everyone's opinion and contribution," "value the time of others by striving to be on time, prepared[,] and actively participating," and "be courteous and compassionate with customers, team members[,] and the community." (SERVE and ALWAYS Standards, Doc. 29-11, Pg. ID 1056-57.)

TriHealth also has an appearance policy. (TriHealth Appearance Policy, Doc. 29-15; Revised TriHealth Appearance Policy, Doc. 29-16.) Under the policy, employees are "to dress according to the standards established by and for the department in which they work." (Revised TriHealth Appearance Policy, Doc. 29-16, Pg. ID 1087.) T-shirts, jackets with writing or pictures that can offend" are considered inappropriate attire under the policy, while "TriHealth Approved Logo Wear" is appropriate. (*Id.* at Pg. ID 1089.) CCHMC also has a dress code policy that prohibits any clothing or personal items with "wording or illustrations that advertise commercial products or express political, suggestive, vulgar, controversial, or divisive viewpoints." (CCHMC Dress Code Policy, Doc. 29-2, Pg. ID 1021-25.)

## II. Plaintiff's Employment

Plaintiff worked in CCHMC as an RN in the Fetal Care Center. (Plaintiff Dep., Doc. 29, Pg. ID 966; Performance Counseling Form, Doc. 29-28, Pg. ID 1114.) In her role, Plaintiff was required to provide "direct and indirect holistic care to patients and their families." (RN Job Description, Doc. 29-11, Pg. ID 1053.) Plaintiff also had to "collaborate[], in a collegial manner, with physicians and other health care team members

3

in meeting the patient[']s needs." (*Id.*) During Plaintiff's employment, Carolyn Slone was the labor and delivery manager for TriHealth and oversaw CCHMC's Fetal Care Center. (*See* Slone Dep., Doc. 27, Pg. ID 875-76.)

### a. First Formal Complaint Against Plaintiff

On February 14, 2019, Slone met with Plaintiff to discuss concerning behavior being displayed by Plaintiff. (2/14/2019 Document of Discussion, Doc. 29-13.) Slone advised that she had witnessed Plaintiff "having negative conversations, cursing and displaying negative body language, like eye rolling, in the nurses' station." (*Id.* at Pg. ID 1059.) Slone further advised that "[i]f these behaviors [did] not improve, it [would] result in formal corrective action, up to and including termination." (*Id.*)

### b. Racial Tension Within the Workplace

Then, following the death of George Floyd in the summer of 2020, a "great deal of discourse" arose at CCHMC and within the Fetal Care Center. (*See* Slone Dep., Doc. 27, Pg. ID 886.) So, Slone reached out to TriHealth's Diversity Equity and Inclusion ("DEI") team to set up a training on diversity and inclusion for the Fetal Care Center's employees. (*Id.* at Pg. ID 887; 8/5/2020 Email, Doc. 29-1, Pg. ID 1014; 8/25/2020 Email, Doc. 29-3, Pg. ID 1026-27.) Slone also encouraged employees to avoid talking about race and politics in the workplace. (Plaintiff Dep., Doc. 29, Pg. ID 990-91.) The training was eventually held, but issues persisted within the Fetal Care Center. (*See id.* at Pg. ID 965-67; 8/25/2020 Email, Doc. 29-3, Pg. ID 1026-27.)

### i. Plaintiff's Complaints

On September 2, 2020, Plaintiff contacted CCHMC's diversity group to complain

4

about racism in the Fetal Care Center. (9/2/2020 Email, Doc. 29-4, Pg. ID 1028.) In her email, Plaintiff discussed the "irony" of CCHMC's clothing policy. (*See id.*) She noted that, before rising racial tensions, people could freely wear whatever clothing items they liked. (*Id.*) But, when she wore a Black Lives Matter ("BLM") shirt and pin, she was reprimanded. (*Id.*) She felt the enforcement of the policy was "ironic" and raised concerns that management was not fixing issues of race within the workplace. (*Id.; see also* Plaintiff Dep., Doc. 29, Pg. ID 991.)

A member of TriHealth's DEI team, Donna Stripling, met with Plaintiff to discuss the matter. (9/4/2020 Email, Doc. 29-5.) In an email summarizing the meeting, Stripling advised that she, Plaintiff, and another employee discussed insensitive comments being made by other nurses regarding George Floyd and the BLM movement. (9/10/2020 Email, Doc. 29-18, Pg. ID 1096.) Plaintiff and the other employee explained to Stripling that they felt "picked on" because they were not allowed to wear BLM shirts. (*Id.*) Stripling advised them of the clothing policies in place and ensured Plaintiff that she would inform CCHMC management of Plaintiff's experiences. (*Id.*)

Plaintiff maintains that she continually complained to Slone about insensitive comments made by other Fetal Care Center employees. (Plaintiff Dep., Doc. 29, Pg. ID 997.) Plaintiff testified that an employee named Jennifer Adams called George Floyd a criminal and drug addict, and suggested that the BLM protests were actually riots. (*Id.* at Pg. ID 989.) Plaintiff also complained that an employee named Angela Irvin commented that Plaintiff and another employee looked alike because they were both "light skinned." (*Id.* at Pg. ID 988, 992.) Plaintiff further testified that other nurses would congregate

5

around the nurses' station and would stop talking if Plaintiff walked up. (*Id.* at Pg. ID 988.) Plaintiff does not recall the dates of these events or when she complained about them to Slone. (*Id.* at Pg. ID 991.)

### ii. Complaints About Plaintiff

On November 5, 2020, a Fetal Care Center manager, Kimberly Burton, complained to Slone that she and others were concerned about Plaintiff's behavior regarding "the election and racism." (11/5/2020 Email, Doc. 29-24, Pg. ID 1106.) For example, Burton refers to an instance where Plaintiff called a CCHMC security guard racist, and encouraged others not to talk to him. (*Id.*) After receiving Burton's complaint, Slone spoke with Plaintiff about the incident, and Plaintiff advised that she had no influence on others to ignore the guard. (12/15/2020 Meeting Notes, Doc. 29-15; Performance Counseling Form, Doc. 29-28, Pg. ID 1114.) Plaintiff does not recall this meeting with Slone, but admits that she called the guard a racist. (Plaintiff Dep., Doc. 29, Pg. ID 968-69, 1004.) Burton later complained again to Slone that Plaintiff "intimidated" others. (*See* 1/4/2021 Email, Doc. 29-19.)

Slone met with Plaintiff on January 27, 2021 to discuss another incident involving Plaintiff. (Slone Dep., Doc. 27, Pg. ID 883; 1/27/2021 Document of Discussion, Doc. 29-22.) Others had reported that Plaintiff had called another employee, Monica Newman, a racist. (1/27/2021 Document of Discussion, Doc. 29-22, Pg. ID 1102.) As a result, Newman allegedly left the Fetal Care Center crying. (*Id.*) Slone discussed the incident with Plaintiff and informed Plaintiff that her "behavior [had] been escalating and creating a hostile work environment for [the Fetal Care Center]" which "also create[d] a barrier to

6

communication which in turn[] put[] patient safety at risk." (*Id.*) Plaintiff denied calling Newman a racist in this meeting. (*Id.*)

Plaintiff does not recall this meeting with Slone, though she does recall the original interaction with Newman. (Plaintiff Dep., Doc. 29, Pg. ID 969, 995, 989-99, 1003.) Plaintiff maintains that she had a conversation with Newman and a third employee named Mark Wimmers that began when Wimmers noted a BLM sticker on Plaintiff's water bottle. (*Id.*) Plaintiff maintains that Wimmers then escalated the conversation to topics like the Blue Lives Matter movement and abortion. (*Id.*) Plaintiff admits that, during the interaction, she told Newman that her actions were racist. (*Id.* at Pg. ID 968, 995.) But, Plaintiff maintains that the topic of abortion caused Newman to cry and leave. (*Id.* at Pg. ID 969.)

### III. Investigation into Plaintiff and Subsequent Termination

Plaintiff took Family and Medical Leave Act ("FMLA") leave beginning on February 1, 2021 because she was experiencing COVID-19 symptoms. (FMLA Designation Notice, Doc. 29-25; Plaintiff Dep., Doc. 29, Pg. ID 1006.) Around this time, CCHMC determined that it would be severing its relationship with Plaintiff. (2/19/2021 Email, Doc. 27-13.) CCHMC did not inform TriHealth of the reason for its decision. (*See id.*) So, Slone began contemplating possible replacement positions for Plaintiff elsewhere within TriHealth's network. (*See id.*) In the meantime, a member of TriHealth's Human Resource Department, Linda Rozzi, began to investigate Plaintiff. (*See, e.g.,* Slone Dep., Doc. 27, Pg. ID 878, 884; February Email Correspondence, Doc. 27-14.)

Through the investigation, Rozzi learned of Plaintiff's actions against the security guard and Newman, as well as other alarming behavior by Plaintiff. (Performance

Counseling Form, Doc. 29-28, Pg. ID 1114.) Rozzi discovered that Fetal Care Center employees felt that Plaintiff made "inappropriate, racially and politically charged statements on a regular basis, creating a threatening and hostile work environment." (*Id.*) Specifically, Plaintiff reportedly said that "[w]e should put all you Republicans in a room and light that bitch on fire" and "[s]nitches get stitches and if she doesn't stop running her mouth its going to happen." (*Id.* at Pg. ID 1114-15.) Plaintiff does not recall making such statements. (Plaintiff Dep., Doc. 27, Pg. ID 1008.)

The investigation also uncovered that Plaintiff was routinely late for shifts, which created "a negative impact on team members and possibly patient care." (Performance Counseling Form, Doc. 29-28, Pg. ID 1115; *see also* Time Sheet, Doc. 31-1.) When other employees commented on Plaintiff's tardiness, she allegedly responded "I'm black, I'm allowed to be late. Children's likes their black people; they won't do anything. I hope they do come at me. I'll play the race card so fast," and "I get here when I get here. I run on colored people time and you should be considerate of that." (Performance Counseling Form, Doc. 29-28, Pg. ID 1115.) Plaintiff again does not recall making these statements. (Plaintiff Dep., Doc. 29, Pg. ID 1008-09.) And, evidence suggests that tardiness was generally an issue for some nurses in the Fetal Care Center. (*See* 8/4/2020 Email, Doc. 27-4.)

After considering the findings of Rozzi's investigation, Defendants decided to terminate Plaintiff on February 22, 2021. (Performance Counseling Form, Doc. 29-28, Pg. ID 1115.) Defendants found that Plaintiff's conduct violated TriHealth's Code of Conduct and ALWAYS behaviors, as her conduct was "disruptive to fellow employees" and could

impact the quality of care and safety to patients. (*Id.*) On February 23, 2021, representatives of Defendants informed Plaintiff of their decision to terminate her. (*Id.*) During that meeting, Plaintiff denied making the statements outlined above but acknowledged that she had an issue with tardiness. (Performance Counseling Form, Doc. 29-28, Pg. ID 1115.) Plaintiff was provided the right to appeal her termination but chose not to do so. (*See id.* at Pg. ID 1115-16; Plaintiff Dep., Doc. 29, Pg. ID 1009.)

## PROCEDURAL POSTURE

On April 12, 2022, Plaintiff brought claims against Defendants in the Hamilton County Court of Common Pleas for (1) racial discrimination in violation of Ohio and federal law, (2) retaliation in violation of Ohio and federal law, and (3) FMLA retaliation. (*See* State Complaint, Doc. 1-3, Pg. ID 14-28; *see also* Compl., Doc. 2, ¶¶ 69-114.) Defendants removed the matter to this Court. (*See* Notice of Removal, Doc. 1.) Then, on December 8, 2023, Defendants moved for summary judgment on all of Plaintiff's claims. (*See* Motion for Summary Judgment, Doc. 31.) Along with her Response to Defendants' Motion for Summary Judgment, Plaintiff filed the deposition transcript of Jeana Adams. (*See* Notice of Filing Deposition of Jeana Adams, Doc. 32.) Defendants moved to strike this transcript. (*See* Motion to Strike, Doc. 34.)

## LAW AND ANALYSIS

### I. Motion to Strike

Defendants move to strike Jeana Adams' deposition transcript, which Plaintiff submitted alongside her Response in Opposition to Defendants' Motion for Summary Judgment. (*See* Adams Dep., Doc. 32; Motion to Strike, Doc. 34.) Granting or denying a

motion to strike is within the sound discretion of the trial court. *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 480 (6th Cir. 2003). The Federal Rules of Civil Procedure do not contemplate motions to strike documents other than pleadings. *See* Fed. R. Civ. P. 12(f); *Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006). However, "trial courts [may] make use of their inherent power to control their dockets . . . when determining whether to strike documents or portions of documents [other than pleadings]." *Zep Inc. v. Midwest Motor Supply Co.*, 726 F. Supp. 2d 818, 822 (S.D. Ohio 2010) (citing *Anthony v. BTR Auto Sealing Sys.*, 339 F.3d 506, 516 (6th Cir. 2003)).

Defendants maintain that the Adams deposition transcript must be stricken because it is inadmissible. (*See* Motion to Strike, Doc. 34.) To be sure, "evidence submitted in opposition to a motion for summary judgment must be admissible." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997). Defendants argue that the transcript was not properly authenticated—and is thus inadmissible—because Adams was not provided the opportunity to review the transcripts of her deposition. (Motion to Strike, Doc. 34, Pg. ID 1221-22.)

Federal Rule of Civil Procedure 30 allows a deponent or party to review the deposition transcript upon request. Rule 30(e) provides:

> **(1) Review; Statement of Changes.** On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
>
> > (A) to review the transcript or recording; and
> >
> > (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

Fed. R. Civ. P. 30(e). "Rule 30 does not explain how an officer must make the transcript 'available' for review." *PNC Equip. Fin. v. Mariani*, 758 F. App'x 384, 388 (6th Cir. 2018). And, this Court is vested with the sound discretion to admit an unsigned deposition "unless the party opposing the transcript shows that the transcript contained inaccuracies or that she was otherwise prejudiced by its introduction." *Id.* at 387 (collecting cases).

Striking the Adams deposition transcript is unnecessary. To be sure, Adams reserved the right to review her transcript. (*See* Adams Dep., Doc. 32-1, Pg. ID 1174.) But, neither party discusses whether the court reporter notified Adams that the transcript was available for review or whether Adams intended to request review. (*See* Motion to Strike, Doc. 34; Response to Motion to Strike, Doc. 36.) So, the Court lacks the facts necessary to determine whether proper procedure was followed. In any event, Defendants neither argue that the transcript contains inaccuracies or that they are otherwise prejudiced by the transcript. (*See* Motion to Strike, Doc. 34.) Thus, the Court finds it appropriate to refrain from striking the transcript.

The authenticity of the Adams deposition transcript is also not at issue. A deposition "is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's [Fed. R. Civ. P. 30(f)] certification that the deposition is a true record of the testimony of the deponent." *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) (quotation omitted). The Adams deposition transcript contains the caption of this case, the name of the deponent, and the court reporter's signed certification. (*See* Adams Dep., Doc. 32-1, Pg. ID 1161, 1174.) Thus,

11

the deposition is properly authenticated.

For these reasons, Defendants' Motion to Strike (Doc. 34) is denied. The Court may accordingly consider the Adams deposition transcript in evaluating Defendants' Motion for Summary Judgment (Doc. 31).

## II. Motion for Summary Judgment

The Court now turns to Defendants' Motion for Summary Judgment (Doc. 31). When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the district court shall grant summary judgment. Fed. R. Civ. P. 56(a). The moving party has the burden to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes the nonmoving party's responsibility to point to specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A court is under no obligation to search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). And, a "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forward probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy*, 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

12

As noted above, Plaintiff brings claims against Defendants for (1) racial discrimination in violation of Ohio and federal law, (2) retaliation in violation of Ohio and federal law, and (3) FMLA retaliation. (Compl., Doc. 2, ¶¶ 69-114.) Both Title VII and Ohio law prohibit employers from discriminating against their employees on the basis of race. *See* 42 U.S.C. § 2000e-2(a)(1); Ohio Rev. Code § 4112.02(A). And, both the FMLA, Title VII, and Ohio law prohibit employers from retaliating against their employees for engaging in protected conduct. 29 U.S.C. § 2615(a)(2); 42 U.S.C. § 2000e-2(a)(1); Ohio Rev. Code § 4112.02(A). The Court may review all these claims together, as they are all analyzed under the same framework. *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 561 (6th Cir. 2004) (Title VII and Ohio discrimination); *Allman v. Walmart, Inc.*, 967 F.3d 566, 571 (6th Cir. 2020) (Title VII and Ohio retaliation); *Donald v. Sybra, Inc.*, 667 F.3d 757, 761-62 (6th Cir. 2012) (FMLA retaliation).

Where, as here, a plaintiff seeks to establish discrimination through indirect, rather than direct evidence, the Court applies the *McDonnell Douglas* burden-shifting framework. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010). The first step of this framework requires a plaintiff to establish a prima facie case for discrimination. *Id.* at 363. To establish a prima facie case for race discrimination, a plaintiff must show that she was: (1) a member of a protected class, (2) qualified for the position, (3) the victim of an adverse employment action, and (4) replaced by someone outside the protected class. *See Singfield*, 389 F.3d at 561. And, a prima facie case of retaliation requires a showing that (1) the plaintiff engaged in protected activity; (2) the defendant knew of this protected activity; (3) the defendant subsequently took an adverse employment action; and (4) a

13

causal connection exists between the protected activity and the adverse employment action. *See Allman*, 967 F.3d at 571 (Title VII and Ohio retaliation); *Donald*, 667 F.3d at 761 (FMLA retaliation).

Once the plaintiff establishes her prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). If the defendant meets its burden, the burden shifts back to the plaintiff to demonstrate that the defendant's reason was but a pretext for unlawful discrimination. *Id.*; *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The Court proceeds on the assumption that Plaintiff has proven her prima facie case. Defendants too satisfy their burden of showing that they terminated Plaintiff for a legitimate, nondiscriminatory reason: Plaintiff's violation of TriHealth's Code of Conduct based on her divisive and disruptive behavior, as well as her routine lateness as previously discussed. (*See* Motion for Summary Judgment, Doc. 31, Pg. ID 1140; Performance Counseling Form, Doc. 29-28, Pg. ID 1114.) Such conduct constitutes a legitimate and nondiscriminatory reason for terminating an employee. *See Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 252 (6th Cir. 2023) (failure to follow company policies constituted a legitimate basis for termination); *Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 528 (6th Cir. 2015) (excessive absenteeism and tardiness were legitimate, nondiscriminatory reasons for terminating an employee); *Lovelace v. BP Prods. N. Am., Inc.*, No. 1:05-CV-2203, 2006 U.S. Dist. LEXIS 63501, at *19-20 (N.D. Ohio Sept. 6, 2020) (engaging in divisive discussions on race in the workplace and calling other employees

14

racist constituted a legitimate, nondiscriminatory reason for termination). The burden thus shifts back to Plaintiff to show that this reason is pretextual.

The fundamental question in the pretext analysis is: did the employer make the adverse employment decision for the stated reason or not? *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). A plaintiff must produce sufficient evidence such that a reasonable jury could doubt the employer's stated reason for its actions. *McCart v. Univ. of Cincinnati Found.*, No. 1:08-CV-656, 2010 U.S. Dist. LEXIS 34406, at *7 (S.D. Ohio Apr. 7, 2010). A plaintiff may refute an employer's proffered legitimate reason by showing that the reason (1) has no basis in fact, (2) did not actually motivate the challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003).

### a. Pretext Related to Race Discrimination and FMLA Retaliation Claims

Plaintiff appears to rely on the same evidence to argue pretext for both her race discrimination and FMLA retaliation claims. (*See* Response to Motion for Summary Judgment, Doc. 33, Pg. ID 1205-09, 1213.) In making her pretext argument for these claims, Plaintiff maintains that Defendants' proffered reason for termination was insufficient because other employees engaged in similar conduct as Plaintiff but were not similarly disciplined. (*See id.*)

To succeed on this argument, Plaintiff must provide evidence that "other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 893 (6th Cir. 2020). Courts look to whether employees outside

15

the protected class "(1) dealt with the same supervisor, (2) [were] subject to the same standards, and whether they (3) engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 328 (6th Cir. 2021) (quotation omitted).

Plaintiff first points out that none of her "Caucasian coworkers were ever reprimanded for their role in racially charged discussions in the workplace." (Response to Motion for Summary Judgment, Doc. 33, Pg. ID 1209.) In support of this argument, Plaintiff relies solely on her own deposition testimony, in which she names three employees who participated in race discussions: Adams, Wimmers, and Irvin. (*See id.*; Plaintiff Dep., Doc. 29, Pg. ID 988-92.) But, Plaintiff does not identify whether Wimmers or Irvin were outside the protected class. (*See id.*) And, while these employees are alleged to have discussed race, Plaintiff does not identify whether their discussions were to the same extent as Plaintiff's. (*See id.*) For example, Plaintiff does not testify that these employees threatened others with physical violence, called their coworkers "racist," or had the same number of complaints brought against them. (*See id.*) Perhaps more importantly, Plaintiff admits that she does not actually know whether these employees were reprimanded for their actions. (*See* Plaintiff Dep., Doc. 29, Pg. ID 992.) Instead, Plaintiff simply assumes that she was the only employee disciplined for her conduct. (*See id.*) Such evidence is insufficient to show that other employees were "not disciplined even though they engaged in substantially identical conduct" as Plaintiff. *See Miles*, 946 F.3d at 894; *Brown v. Ohio State Univ.*, 616 F. Supp. 2d 740, 759 (S.D. Ohio 2009) (explaining that

16

plaintiff's assumptions that she was the only employee reprimanded, without any supporting evidence, could not show pretext). So, this evidence fails to show pretext.

Plaintiff also argues that she was uniquely disciplined for tardiness and for violating CCHMC's dress code policy. (Response to Motion to Dismiss, Doc. 33, Pg. ID 1207; Statement of Facts, Doc. 33-2, Pg. ID 1218-19.) As an initial matter, Plaintiff was not terminated for violating CCHMC's dress code policy. (*See* Performance Counseling Form, Doc. 29-28.) And, in any event, the evidence provided in support of this argument is entirely based on Plaintiff's own subjective beliefs and speculations. (*See* Statement of Facts, Doc. 33-2, Pg. ID 1218-19; Plaintiff Dep., Doc. 29, Pg ID 990-92.) Plaintiff does not provide the identity of any employee who engaged in such similar conduct, nor does she identify if those employees were disciplined, or whether they had similar disciplinary histories as Plaintiff. (*See* Plaintiff Dep., Doc. 29, Pg. ID 990-92.) Again, such speculation is not enough to create an issue of fact related to pretext. *See Reams v. Int'l Union of Operating Eng'rs*, No. 23-3242, 2023 U.S. App. LEXIS 33523, at *13 (6th Cir. Dec. 18, 2023) ("[The plaintiff] also cannot rely on the third option for showing pretext . . . because she does not make the required showing of a comparator.").

Thus, Plaintiff has not met her burden to show pretext for her Ohio and Title VII race discrimination claims or her FMLA retaliation claim.

### b. Pretext Related to Ohio Retaliation Claim

Next, Plaintiff presents no argument to demonstrate pretext for her Title VII and Ohio retaliation claims. (*See* Response to Motion for Summary Judgment, Doc. 33, Pg. ID 1209-12.) Rather, Plaintiff solely argues that she has created a prima facie case of

17

retaliation. (*See id*.) This is not enough to demonstrate pretext. *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1314 (6th Cir. 1989) ("Since [the plaintiff] has failed to set forth any evidence to rebut [the defendant's] legitimate and nondiscriminatory reason for his demotion," summary judgment on Plaintiff's retaliation claim was proper.) In any event, as discussed above, Plaintiff has presented no evidence to demonstrate pretext by Defendants.

Thus, Plaintiff has not met her burden to show pretext for her Ohio and Title VII retaliation claims.

*    *    *

Plaintiff fails to show that Defendants' proffered reason for terminating her was pretextual. Accordingly, summary judgment must be entered in favor of Defendants on all of Plaintiff's claims.

## CONCLUSION

Based on the foregoing, the Court **ORDERS** the following:

1. Defendants' Motion for Summary Judgment (Doc. 31) is **GRANTED**;

2. Defendants' Motion to Strike (Doc. 34) is **DENIED**;

3. Summary Judgment is **ENTERED** in favor of Defendants on all of Plaintiff's claims; and

4. This case is **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND